Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| OFICINA DE ÉTICA GUBERNALMENTAL<br><br>Recurrida<br><br>V.<br><br>YONIEL ARROYO MUÑIZ<br><br>Recurrente | KLRA202500096 | Revisión procedente de la Oficina de Ética Gubernamental<br><br>Caso Núm.:<br>21-37<br><br>Sobre: Violación al Artículo 4.2 (b), (r) y (s) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Candelaria Rosa y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de abril de 2025.

Comparece el señor Yoniel Arroyo Muñiz (señor Arroyo Muñiz o recurrente) y solicita que revisemos una *Resolución* emitida el 5 de diciembre de 2024 por la Oficina de Ética Gubernamental (OEG o recurrida).[1] Mediante esta, resolvió que el recurrente contravino los incisos (b) y (r) del Artículo 4.2 de la *Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico*, Ley Núm. 1-2012, 3 LPRA sec. 1857a (*Ley de Ética Gubernamental*) al utilizar el vehículo oficial asignado para beneficio personal. Por ello, le impuso una multa y una medida administrativa de restitución. A su vez, desestimó y archivó las imputaciones de violación al inciso (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra*, sec. 1857a.

Por los fundamentos que expondremos a continuación, se adelanta la confirmación de la determinación recurrida.

---

[1] Apéndice del *Recurso de Revisión*, Anejo 40, págs. 1,506-1,530. Archivada y notificada el 6 de diciembre de 2024.

**I.**

Este caso se originó el 8 de marzo de 2018, fecha en que el entonces representante Carlos Bianchi Angleró le solicitó a la OEG que realizara una investigación por posibles violaciones por parte del señor Arroyo Muñiz a la *Ley Uniforme de Vehículos Oficiales del Estado Libre Asociado de Puerto Rico*, Ley Núm. 60-2014, según enmendada, 3 LPRA sec. 9091 *et seq.* (*Ley de Vehículos Oficiales*).[2]

Tras culminar la etapa de investigación preliminar y exhaustiva, el 23 de diciembre de 2020, la OEG presentó una *Querella* contra el señor Arroyo Muñiz por violación a los incisos (b) (r) y (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra*, sec. 1857a.[3] En esta, sostuvo que el recurrente, como vicepresidente ejecutivo de administración en la Autoridad de Acueductos y Alcantarillados (AAA), tenía asignado un vehículo oficial, pero alegó que del 4 de abril de 2017 al 7 de marzo de 2018, el recurrente utilizó dicha propiedad pública en ciento treinta y tres (133) ocasiones para beneficio personal al transportarse desde las instalaciones de Operaciones en Aguadilla, cerca de su residencia, hasta su lugar de trabajo en la Sede de la AAA en San Juan. La OEG señaló que la anterior acción no permitida por ley provocó la pérdida de fondos públicos por el pago de gasolina, peaje y mantenimiento del vehículo.

Establecido lo anterior, la OEG esgrimió que el señor Arroyo Muñiz infringió el Artículo 3 de la *Ley Uniforme de Vehículos Oficiales, supra*, sec. 9092, ya que utilizó el vehículo oficial luego de concluir la jornada laboral, sin que le aplicaran las excepciones dispuestas en el Artículo 5 del referido estatuto, sec. 9094. A su vez, expuso que el recurrente contravino los incisos (b) (r) y (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra*, sec. 1857a, y la Orden Administrativa 2015-03 de la AAA, entre otras disposiciones legales. Por ello, solicitó

---

[2] *Íd.*, Anejo 1, págs. 1-6.
[3] *Íd.*, Anejo 2, págs. 7-10.

la imposición de una multa y medidas administrativas al recurrente por cada infracción.

El 29 de enero de 2021, el señor Arroyo Muñiz presentó una *Contestación a Querella*, en la que alegó que nunca utilizó el vehículo oficial para beneficio personal.[4] Precisó que, al contrario, cumplió con las responsabilidades inherentes de su puesto relacionadas al funcionamiento operacional y administrativo de la Oficina del Presidente Ejecutivo, así como monitorear los servicios, las actividades y los proyectos de la AAA. A su vez, aseveró que, al igual que otros funcionarios públicos, tuvo que atender situaciones imprevistas cerca de su residencia.

Posteriormente, el 18 de enero de 2022, el recurrente presentó una *Moción de Desestimación*.[5] En su exposición, adujo que se debía desestimar la *Querella* en su contra, debido a que se presentó tardíamente y en violación de la doctrina de incuria. Además, afirmó que la OEG no realizó la investigación dentro del término establecido en el Artículo 7.1 de la *Ley de Ética Gubernamental, supra,* sec. 1860. Ello, puesto que el procedimiento investigativo de este caso inició el 8 de marzo de 2018, por lo que la agencia disponía de noventa (90) días para culminar esta etapa, extensivo a noventa (90) días adicionales. Expuso que, por excepción, la OEG podía demostrar justa causa para extender la investigación por el término de un año, nuevamente extensivo a un año hasta el 6 de septiembre de 2020. Sin embargo, subrayó que la OEG debía desistir del caso, en vista de que realizó gestiones investigativas posterior a vencer el término para culminar el trámite investigativo sin demostrar justa causa.

Asimismo, enfatizó que para que la *Ley de Vehículos Oficiales, supra,* le fuera aplicable, se requería un reglamento. De esta manera, sostuvo que se violó su debido proceso de ley al aplicarle tal estatuto

---

[4] *Íd.,* Anejo 3, 11-13.
[5] *Íd.,* Anejo 8, págs. 42-133.

sin que la Administración de Servicios Generales promulgara el *Reglamento para la Administración y Control de Vehículos de Motor y Otros Medios de Transporte del Gobierno de Puerto Rico*, Reglamento Núm. 9177, Departamento de Estado, 12 de mayo de 2020 (*Reglamento de Vehículos del Gobierno*). Pues, adujo que si los hechos imputados en la *Querella* ocurrieron entre los años 2017 al 2018 y el *Reglamento de Vehículos del Gobierno, supra*, se aprobó en el año 2020, la *Ley de Vehículos Oficiales, supra*, era inaplicable a su caso. Ante tal apreciación, articuló que el vacío de la *Ley de Vehículos Oficiales, supra*, se suplió con la Orden Administrativa 2015-03 de la AAA en la que se permitió que varios funcionarios estacionaran los vehículos oficiales en las facilidades de la AAA que quedaran cercanas a sus residencias para atender cualquier emergencia.

A su vez, el señor Arroyo Muñiz planteó que le aplicaba la defensa de obediencia jerárquica, toda vez que actuó de conformidad con unas órdenes que no revestían de ilicitud, incluyendo la instrucción verbal del presidente ejecutivo de la AAA, el señor Elí Díaz Atienza (señor Díaz Atienza), y la Orden Administrativa 2015-03 de la AAA. Por lo anterior, reiteró que no violentó el Artículo 4.2 de la *Ley de Ética Gubernamental, supra*, sec. 1857a, al utilizar el vehículo oficial asignado para realizar las funciones inherentes de su puesto.

Eventualmente, el 14 de febrero de 2022, la OEG presentó su *Oposición a Moción de Desestimación*.[6] En lo esencial, puntualizó que el lenguaje libre de ambigüedades de la *Ley de Vehículos Oficiales, supra*, hacía innecesario promulgar un reglamento para aplicar el estatuto a los hechos de este caso. Por otra parte, especificó que si bien era cierto que la Orden Administrativa 2015-03 regulaba el uso de vehículos de motor en la AAA, no podía ser contraria a las disposiciones de la *Ley de Vehículos Oficiales, supra*. Señaló que

---

[6] *Íd.*, Anejo 9, págs. 134-153.

dicha Orden era aplicable a los empleados que atendieran cualquier emergencia o situación de atención inmediata. Sin embargo, esgrimió que las bitácoras del vehículo oficial asignado al recurrente no reflejaron este tipo de gestión, sino que utilizaba dicha propiedad pública para viajar desde su residencia hasta su lugar de trabajo y viceversa, sin tener que sufragar los gastos de gasolina y peaje.

De otra parte, la OEG alegó que el trámite investigativo se efectuó de acuerdo con los términos de cumplimiento estricto del Artículo 7.1 de la *Ley de Ética Gubernamental, supra,* sec. 1860, el cual no exigía acreditar justa causa. Específico que la investigación preliminar comenzó el 8 de marzo de 2018 y se extendió por un término de noventa (90) días hasta el 6 de junio de 2018. Adujo que este término adicional se extendió por noventa (90) días hasta el 4 de septiembre de 2018, fecha en la que se inició un término de un año para realizar una investigación exhaustiva, extensivo por un año hasta el 4 de septiembre de 2020. La OEG resaltó que la investigación dependió de su escaso personal, la respuesta de terceras personas y el cierre provocado por la pandemia del COVID-19. No obstante, destacó que el Artículo 7.2 de la *Ley de Ética Gubernamental, supra,* sec. 1860a, ni la Sección 3.2 de la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico,* Ley Núm. 38-2017, según enmendada, 3 LPRA sec. 9642 (LPAUG), disponían un término para la presentación de la *Querella.* Aun así, sostuvo que la *Querella* no se presentó en un término excesivo ni abusivo.

Así las cosas, el 11 de marzo de 2022, la oficial examinadora de la OEG emitió una *Orden,* en la que denegó la solicitud de desestimación del recurrente.[7] Entre otros, que el inciso (b) del Artículo 7.1 de la *Ley de Ética Gubernamental, supra,* sec. 1860, no

---

[7] *Íd.,* Anejo 12, págs. 158-164. Al estar inconforme, el señor Arroyo Muñiz solicitó una reconsideración que la OEG declaró No Ha lugar. Además, presentó un *Recurso de Revisión Judicial* que este Tribunal de Apelaciones desestimó por falta de jurisdicción al tratarse de un asunto interlocutorio no revisable.

exigía que la recurrida tuviese que solicitar la extensión de los términos investigativos ni demostrar justa causa. Por ello, resolvió que la OEG prorrogó los términos para culminar su investigación dentro del ejercicio de su discreción por entender que estaba justificado. Por otro lado, estableció que las circunstancias extraordinarias de la pandemia del COVID-19 justificaron la extensión de los términos para la OEG realizar una investigación y presentar la *Querella.*

Igualmente, la oficial examinadora de la OEG resolvió que no le asistía la razón al señor Arroyo Muñiz respecto a que no se le podía aplicar la *Ley de Vehículos Oficiales, supra,* hasta que se promulgara una reglamentación. Ello, pues, apreció que el análisis del recurrente tornaría inoperante los preceptos la *Ley de Vehículos Oficiales, supra,* vigente al momento de ocurrir los hechos imputados en su contra.

Tiempo después, el señor Arroyo Muñiz presentó una *Solicitud de Resolución Sumaria (Solicitud Sumaria),* la cual fue denegada por virtud de una *Orden* emitida el 24 de enero de 2023 por una oficial examinadora de la OEG.[8] Su decisión se fundamentó en que existían hechos materiales y esenciales controvertidos en torno a la jornada laboral del recurrente, ciertos aspectos de su puesto y si sus acciones socavaron la confianza pública en las instituciones gubernamentales.

Tras varias incidencias procesales, el 10 de agosto de 2023, el señor Arroyo Muñiz presentó otra *Solicitud de Resolución Sumaria.*[9] En este escrito, sostuvo que no existía controversia sobre una serie de hechos que pudieran acelerar la disposición de la *Querella* y que demostraban que no infringió los incisos (b), (r) y (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a. El recurrente expresó que obtuvo el permiso verbal del presidente ejecutivo de la AAA para estacionar el vehículo oficial asignado en las facilidades de

---

[8] *Íd.,* Anejo 22, págs. 386-390.
[9] *Íd.,* Anejo 24, págs. 393-1,276.

Operaciones en Aguadilla, lo cual hizo constar en las bitácoras vehiculares. Por ello, interpretó que actuó de conformidad con el Artículo 4 de la *Ley de Vehículos Oficiales, supra,* sec. 9093, al entregar el vehículo oficial en una facilidad de la agencia, aun cuando estuviese adscrito a la Sede de la AAA en San Juan.

A su vez, apuntó que la OEG no evidenció mediante prueba clara, robusta y convincente que obtuvo un beneficio no permitido por ley ni que los viajes se realizaron para otro propósito que no estuviesen dentro del marco de su jornada laboral. Pues, alegó que su jornada laboral no comenzaba ni finalizaba en la Sede de la AAA en San Juan, toda vez que debía trasladarse por toda la Isla para asegurarse que las operaciones de la AAA fuesen adecuadas y debía estar disponible para atender cualquier emergencia.

Posteriormente, el 11 de septiembre de 2023, la OEG presentó una *Oposición a Solicitud de Resolución Sumaria a favor del Querellado y Solicitud de Resolución Sumaria a favor de la Parte Querellante.*[10] En esta, concurrió con el señor Arroyo Muñiz en varios hechos esenciales sobre los cuales entendían que no existía controversia y propuso otros hechos adicionales incontrovertidos. Arguyó que la prueba recopilada evidenció de manera clara, robusta y convincente que se configuraron todos los elementos de violación a los incisos (b), (r) y (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a.

En primer lugar, la OEG subrayó que el recurrente violentó el inciso (b) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a. Ello, ya que utilizó sus facultades como vicepresidente de la AAA para transportarse con un vehículo oficial hasta un lugar convenientemente cercano a su residencia, aun cuando debía estacionarlo en la Sede en San Juan. Esto, sin pagar peaje ni gasolina

---

[10] *Íd.,* Anejo 29, págs. 1,286-1,363.

para viajar desde su hogar y sin utilizar el vehículo para gestiones de emergencia u oficiales. La recurrida especificó que de las ciento veintiséis (126) ocasiones en las que el señor Arroyo Muñiz utilizó el vehículo oficial desde Aguadilla, no surgió que atendió una situación de emergencia constante que requiriera su atención las veinticuatro (24) horas de los siete (7) días en la semana. Enfatizó que, como cualquier servidor público, el recurrente podía utilizar su vehículo privado para transportarse desde su residencia hasta su lugar de empleo y asumir los gastos de viaje.

En segundo lugar, la recurrida manifestó que el señor Arroyo Muñiz infringió el inciso (r) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a, puesto que omitió el deber que impone la *Ley de Vehículos Oficiales, supra,* sobre limitar el uso del vehículo oficial a la gestión laboral y el ejercicio exclusivo de la función pública. Con ello, indicó que el recurrente provocó la pérdida de fondos públicos para sufragar los gastos de gasolina, peaje y mantenimiento del vehículo oficial en gestiones personales. Pues, reiteró que los viajes entre Aguadilla y San Juan no perseguían un fin público más allá de proveer un transporte gratuito a un gerencial de la AAA. Alegó que las bitácoras del vehículo oficial reflejaron que cuando el recurrente culminaba sus quehaceres en San Juan, se dirigía a Aguadilla sin ninguna tarea de visita, supervisión, atender una emergencia, u otra justificación que no fuese acercarse a su residencia. La OEG enfatizó que descontó la utilización del vehículo oficial para las gestiones relacionadas al paso del huracán María desde el 22 de septiembre de 2017 al 27 de octubre de 2017.

En tercer lugar, la OEG expuso que el recurrente contravino el inciso (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a, en vista de que incurrió en acciones que quebrantaron la imagen de rectitud, honradez y decencia de un funcionario público.

Por otro lado, la OEG aceptó que no existía controversia en que el señor Díaz Atienza autorizó verbalmente al recurrente para que devolviera el vehículo oficial en las instalaciones de Operaciones en Aguadilla tras concluir su jornada laboral. No obstante lo anterior, especificó que todo servidor público debe velar por el fiel cumplimiento con la *Ley de Vehículos Oficiales, supra,* por lo que autorización verbal no podía ser contraria al referido estatuto que limitó el uso del vehículo oficial únicamente a la gestión laboral y el ejercicio de la función pública.

Acto seguido, el 16 de octubre de 2023, el señor Arroyo Muñiz presentó una réplica a la oposición de la OEG.[11] En síntesis, puntualizó que la recurrida no presentó prueba de refutación ni demostró que utilizó el vehículo oficial fuera de su jornada laboral. Además, argumentó que no se evidenció que se aprovechó personalmente de propiedad pública, ni que obtuvo beneficios por el pago de peajes, mantenimiento o gasolina. El recurrente enfatizó que la OEG no refutó que debía supervisar los cinco (5) almacenes regionales y atender situaciones de emergencias las veinticuatro (24) horas de los siete (7) días de la semana. De otra parte, expresó que la OEG no controvirtió que debía utilizar el vehículo oficial para visitar las facilidades de la AAA en el trayecto de Aguadilla a San Juan.

Asimismo, el señor Arroyo Muñiz apuntó que, tras el paso del huracán María, debía visitar diariamente el Centro de Operaciones de Emergencia en la Región de Aguadilla. Igualmente, adujo que la OEG no refutó el hecho de que, al finalizar la jornada laboral, entregaba las llaves del vehículo oficial al guardia de Operaciones de la AAA en Aguadilla y no lo estacionaba en su residencia.

Subsiguientemente, el 7 de noviembre de 2023, la OEG presentó una dúplica a la réplica del señor Arroyo Muñiz.[12] En lo

---

[11] *Íd.,* Anejo 33, págs. 1,370-1,472.
[12] *Íd.,* Anejo 35, págs. 1,474-1,494.

pertinente, subrayó que el hecho de que el señor Arroyo Muñiz haya entregado el vehículo oficial en las facilidades de Operaciones en Aguadilla no implicaba la desestimación de la *Querella*. Pues, expresó que el recurrente no podía llevarse el vehículo para su residencia ni permanecer con él las veinticuatro (24) horas de los siete (7) días de la semana, toda vez que no gozaba de una de las excepciones de la *Ley de Vehículos Oficiales, supra*. A su vez, resaltó que de las bitácoras vehiculares surgió que no se justificaba el uso del vehículo oficial, ya que el señor Arroyo Muñiz no atendía emergencias, sino gestiones administrativas tradicionales de su trabajo.

El 26 de noviembre de 2024, el oficial examinador emitió un *Informe*, en el que formuló las siguientes determinaciones de hechos:

1. La AAA está compuesta de cinco regiones: Región Metro, Región Norte, Región Sur, Región Este y Región Oeste. Cada una de estas regiones posee entre tres a cuatro áreas operacionales.
2. La Región Oeste está compuesta por tres áreas operacionales que comprenden: San Germán, Mayagüez y Aguadilla.
3. El señor Arroyo Muñiz comenzó a trabajar en la AAA el 12 de abril de 2007.
4. Durante el periodo del 2 de marzo de 2017 al 4 de mayo de 2018, el señor Arroyo Muñiz se desempeñó en el puesto de confianza de vicepresidente Ejecutivo de Administración de la AAA, por lo que fue un servidor público durante el mencionado periodo. Mientras ocupó dicho puesto, su supervisor inmediato fue el Ing. Elí Díaz Atienza, entonces presidente ejecutivo de la AAA.
5. La orden administrativa OA-2015-003, aprobada el 21 de julio de 2015, fue promulgada con el propósito de regular el uso de la flota de vehículos oficiales de la AAA. Dicha orden estuvo vigente mientras el querellado ocupó la posición de vicepresidente ejecutivo de administración de la AAA.
6. Al momento de los hechos alegados en la querella, la residencia del señor Arroyo Muñiz ubicaba en [...] Aguadilla, Puerto Rico. Este lugar quedaba a una distancia de 10 minutos de Operaciones Aguadilla de la AAA.
7. La oficina del querellado, mientras se desempeñó como Vicepresidente Ejecutivo de Administración, ubicaba en la Región Sede de la AAA en San Juan, Puerto Rico.
8. Como vicepresidente Ejecutivo de Administración de la AAA, el señor Arroyo Muñiz tuvo, entre otras, las siguientes responsabilidades:
   a. El funcionamiento operacional y administrativo de los directorados a su cargo, tales como: Directorado de Recursos Humanos y Relaciones Laborales, Compra y Logísticas, Seguridad Corporativa y Manejo de Emergencias y Administración Central.
   b. Monitorear el cumplimiento de las metas y objetivos conforme a la misión de los directorados bajo su supervisión. Dar seguimiento al cumplimiento de las

métricas e indicadores establecidos y actuar e intervenir como facilitador de las acciones para asegurar el logro de los resultados y expectativas del servicio.

c. Establecer una comunicación directa con los directores de los directorados, directores ejecutivos regionales y directores auxiliares, líderes sindicales, representantes de grupos laborales y con representantes de las agencias reguladoras, funcionarios del gobierno y municipios, con contratistas y empresarios para asegurar la efectividad, calidad y cumplimiento de los compromisos, contratos y planes de trabajo, nuevas iniciativas de servicios y desarrollo de proyectos.

d. Participar con el Presidente Ejecutivo en el desarrollo de estrategias y planes de acción para que las actividades de los directorados bajo su responsabilidad se realicen conforme con los estándares de eficiencia, calidad y productividad y los servicios se presenten con la celeridad requerida.

e. Visitar las facilidades, instalaciones y plantas de la AAA para monitorear servicios, actividades y proyectos, verificar el desarrollo de nuevas estrategias, cumplimiento y el progreso de acuerdo con la planificación y programación establecida.

f. Actuar proactivamente y con sentido de urgencia para anticipar situaciones y evitar el impacto adverso a la consecución de las metas y los objetivos de trabajo de los directorados de la AAA, en la Oficina Central y regiones.

g. Participar conjuntamente con los directores y directores ejecutivos regionales en el desarrollo e implantación de planes de contingencia para atender situaciones de emergencia y conflictos laborales que afecten las operaciones en el servicio de la AAA.

h. Representar al Presidente Ejecutivo en las actividades que le fueran delegadas; participar activamente en comités especiales y equipos de trabajo para desarrollar estrategias, nuevos servicios y emitir recomendaciones.

9. Por las responsabilidades que conllevaba el puesto ocupado por el señor Arroyo Muñiz era requisito que éste tuviera disponibilidad para trabajar fuera del horario regular de trabajo, incluyendo sábados, domingos y días feriados.

10. Por ser un empleado bajo la categoría de confianza, el querellado sólo registraba su asistencia una sola ocasión durante cada día de trabajo mediante el sistema Kronos. Este sistema, a su vez, le permitía registrar su asistencia diaria en cualquiera de las facilidades de las cinco regiones de la AAA y en cualquiera de las principales plantas de esta corporación pública.

11. Por las funciones de su puesto, durante el periodo de abril de 2017 a marzo de 2018, el querellado tuvo asignado el vehículo oficial de la flota de la Región Sede de la AAA, marca Grand Cherokee, color negro, tablilla HYK427 [...]

12. El vehículo oficial Grand Cherokee con número de tablilla HYK427, formaba parte de la flota vehicular de la Región Sede de la AAA.

13. El querellado utilizó el vehículo oficial desde el 4 de abril de 2017 hasta el 7 de marzo de 2018.

14. Para ese mismo periodo, el señor Arroyo Muñiz utilizó, en 126 ocasiones, el vehículo oficial asignado para transportarse desde Aguadilla a San Juan y viceversa.

15. El Ing. Elí Díaz Atienza, entonces Presidente Ejecutivo de la AAA, autorizó, de forma verbal, al querellado a devolver el vehículo oficial que tenía asignado en la instalación de Operaciones Aguadilla de la AAA.

16. La ruta que usaba el querellado para trasladarse desde Operaciones Aguadilla hasta la Oficina Sede de la AAA en San Juan era Carretera #2, luego Carretera PR 22, luego la PR 18 y, finalmente, la Avenida Barbosa. Dicho trayecto le tomaba dos horas.

17. Desde el Municipio de San Juan hasta el Municipio de Aguadilla hay una distancia aproximada de 80 millas.

18. Al finalizar su jornada, el querellado estacionaba, diariamente, el vehículo oficial asignado en Operaciones de Aguadilla. De allí lo recogía para trasladarse a su oficina en la sede de la AAA en San Juan o hacia otras facilidades de dicha corporación pública alrededor de todo Puerto Rico.

19. El señor Arroyo Muniz hacía constar con su firma, en la *Bitácora Vehicular de Jornada Laboral Diaria* de la AAA, el uso que le daba al mismo y los viajes que realizaba.

20. La información que el querellado anotaba en la Bitácora era la hora de salida y llegada, millaje del vehículo al momento de la salida y al momento de la llegada y un resumen de los viajes realizados con el vehículo oficial, además de cualquier otra incidencia relacionada al uso de dicho vehículo.

21. El querellado, diariamente, entregaba las llaves del vehículo de motor asignado al guardia de seguridad que se encontraba en la caseta de las facilidades de Operaciones de la AAA en Aguadilla y, por las mañanas, recogía las llaves en el mismo lugar.

22. La AAA sufragaba los costos de peaje, combustible y mantenimiento del vehículo oficial de la AAA, asignado al querellado.

23. El gasto total de la AAA por el uso de la Grand Cherokee, por el querellado, durante el periodo comprendido entre el 4 de abril de 2017 hasta el 7 de marzo de 2018, fue de $2,244.66 en gasolina, $1,140.27 en peajes y $2,527.33 por desgaste y mantenimiento del vehículo. No incluye los gastos por los viajes incurridos desde el 22 de septiembre de 2017 hasta el 27 de octubre de 2017 por motivo del paso de los huracanes Irma y María por Puerto Rico.

24. Para el 2017, la AAA carecía de un sistema híbrido donde a un funcionario, a quien se le asignaba un vehículo oficial para su uso dentro de la jornada laboral, también se le permitiera solicitar el reembolso de gastos de millaje y peaje por el uso del vehículo en cuestión en gestiones oficiales.

25. En septiembre de 2017, los huracanes Irma y María impactaron directamente a Puerto Rico, provocando que se declarara la isla en estado de emergencia.

26. Para atender las emergencias relacionadas con el funcionamiento de las áreas operacionales de la AAA por motivo del paso de ambos fenómenos atmosféricos, el querellado utilizó el vehículo oficial de la AAA del 22 de septiembre al 27 de octubre de 2017.

27. El 17 de septiembre de 2017, el Ing. Elí Díaz Atienza, entonces presidente ejecutivo de la AAA, activó el Plan de Contingencia para eventos atmosféricos de dicha corporación pública para atender el paso inminente de los Huracanes Irma y María por Puerto Rico.

28. Al momento de los hechos expuestos en la Querella, la Administración de Servicios Generales no había aprobado un reglamento al amparo de la Ley 60.

Según el oficial examinador, la prueba documental demostró que el señor Arroyo Muñiz, como vicepresidente ejecutivo de administración en la AAA, realizó ciento veintiséis (126) viajes

durante el periodo de 4 de abril de 2017 hasta el 7 de marzo de 2018 que totalizaron las ciento sesenta y dos (162) millas recorridas. Sostuvo que lo anterior provocó el desembolso de fondos públicos por $2,244.66 en gasolina, $1,140.27 en peajes y $2,527.33 por desgaste y mantenimiento del vehículo oficial. Asimismo, indicó que del referido cómputo se excluyó los gastos incurridos por los viajes relacionados a los huracanes Irma y María.

Ante ello, concluyó que se configuraron los cuatro (4) requisitos del Artículo 4.2 (b) de la *Ley de Ética Gubernamental, supra,* sec. 1857a, ya que el recurrente era un servidor público, que utilizó los deberes o las facultades de su cargo para obtener alguna ventaja, beneficio o privilegio que no estaba permitido por ley. Consignó que se demostró de manera clara, robusta y convincente que el señor Arroyo Muñiz utilizó convenientemente el vehículo oficial como transporte personal entre Aguadilla y San Juan, sin incurrir en gastos personales de gasolina, peaje y mantenimiento. El oficial examinador determinó que el recurrente estaba obligado a estacionar el vehículo en su lugar regular de trabajo en la Sede de la AAA en San Juan tras concluir su jornada laboral, a tenor con la *Ley de Vehículos Oficiales, supra,* y la Orden Administrativa 2015-03 de la AAA. Pues, manifestó que la OEG demostró que rendía sus labores en un horario regular de 7:30 a.m. a 4:00 p.m., además de estar disponible fuera del horario regular de trabajo. Cónsono con lo anterior, precisó que el señor Arroyo Muñiz quebrantó el Artículo 4.2 (r) de la *Ley de Ética Gubernamental, supra,* sec. 1857a, al omitir el cumplimiento de un deber impuesto por la *Ley de Vehículos Oficiales, supra,* y la Orden Administrativo 2015-03 de la AAA.

El oficial examinador no acogió la alegación del señor Arroyo Muñiz en que podía entregar el vehículo oficial en las instalaciones de Operaciones en Aguadilla que formaba parte de la agencia, de acuerdo con el Artículo 4 de la *Ley de Vehículos Oficiales, supra,* sec.

9093. Pues, determinó que el recurrente desvirtuó la aludida disposición legal, ya que le otorgaría la potestad de estacionar el vehículo oficial asignado en cualquiera de las cinco (5) regiones de la AAA. Igualmente, no le otorgó la razón al señor Arroyo Muñiz en que tenía la autorización verbal del presidente ejecutivo de la AAA de devolver el vehículo oficial en Aguadilla, ya que no se cumplió con los criterios expuestos en la Orden Administrativa 2015-03 de evaluar la naturaleza de sus funciones, la costo-eficiencia que representaba para la AAA, los servicios que se prestaba a la ciudadanía, el espacio y la seguridad de la instalación.

Pese a lo anterior, estableció que la OEG no presentó prueba clara, robusta ni convincente que demostrara que el señor Arroyo Muñiz violentó el Artículo 4.2 (s) de la *Ley de Ética Gubernamental, supra,* sec. 1857a, sobre que el público tuvo la impresión de que la acción antiética del recurrente era impropia. En tal sentido, sugirió archivar la imputación de violación al inciso (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a. Sin embargo, recomendó encontrar al recurrente incurso en violación de los incisos (b) y (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a, e imponer una multa administrativa y restitución.

Sometido el asunto ante su consideración, el 5 de diciembre de 2024, el director ejecutivo de la OEG emitió una *Resolución.*[13] En esta, acogió el *Informe* del oficial examinador en su totalidad y lo hizo parte de la *Resolución.* Consecuentemente, resolvió que el señor Arroyo Muñiz incurrió en violación a los incisos (b) y (r) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a. Por ello, le impuso una multa administrativa de $2,500 por cada violación y una medida administrativa de restitución de $5,912.26 por concepto de pérdida de fondos públicos por gasolina ($2,244.66), peaje

---

[13] *Íd.,* Anejo 40, págs. 1,506-1,530. Archivado y notificado el 6 de diciembre de 2024.

($1,140.27) y desgaste y mantenimiento del vehículo ($2,527.33). Además, desestimó y archivó la imputación de violación al inciso (s) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a.

Por estar inconforme con la determinación anterior, el 26 de diciembre de 2024, el señor Arroyo Muñiz presentó una *Moción en Solicitud de Reconsideración.*[14] En síntesis, sostuvo que el director ejecutivo de la OEG erró al adoptar el *Informe* del oficial examinador en su totalidad por no abordar la prueba presentada ni las determinaciones de hechos formuladas en la *Orden* del 24 de enero de 2024. Además, alegó que el director ejecutivo de la OEG se excedió del periodo de noventa (90) días para emitir una resolución final e impuso una multa arbitraria e irrazonable.

El 9 de enero de 2025, el director ejecutivo de la OEG emitió una *Resolución en Reconsideración* en la que denegó la reconsideración solicitada por el recurrente.[15]

Aún insatisfecho, el 12 de febrero de 2025, señor Arroyo Muñiz presentó este *Recurso de Revisión,* en el que planteó que el director ejecutivo de la OEG incidió en cometer los siguientes errores:

1. ERRÓ EL DIRECTOR EJECUTIVO DE LA OEG AL ADOPTAR EN SU TOTALIDAD EL INFORME DEL CUARTO OFICIAL EXAMINADOR DESIGNADO, LCDO. JAIME A. VÁZQUEZ COLÓN, AL NO DESESTIMAR Y ARCHIVAR LA QUERELLA, ESTANDO LA MISMA PRESCRITA AL SER RADICADA EL 23 DE DICIEMBRE DE 2020[,] VIOLANDO ASÍ LA LEY ORGÁNICA DE LA OFICINA DE ÉTICA GUBERNAMENTAL, SEGÚN [EL] ART. 7.1 (B) [DE LA] LPAU[G,] 3 LPRA SEC. 1860 (B).

2. ERRÓ EL DIRECTOR EJECUTIVO DE LA OEG AL RESOLVER ESTE CASO TARDÍAMENTE EN EXCESO AL PER[Í]ODO DISPUESTO DE NOVENTA (90) DÍAS LUEGO DE SOMETIDO PARA RESOLUCIÓN FINAL, ART. 6.15 DEL REGLAMENTO DE ASUNTOS PROGRAMÁTICOS DE LA OEG Y LA SECCIÓN 3.14 DE [LA] LPAU[G].

3. ERRÓ EL DIRECTOR EJECUTIVO DE LA OEG AL ADOPTAR EN SU TOTALIDAD EL INFORME DEL CUARTO OFICIAL EXAMINADOR DESIGNADO, LCDO. JAIME A. VÁZQUEZ COLÓN, EL CUAL INCUMPLE LA ORDEN FECHADA 23 DE ENERO DE 2023 DICTADA POR LA SEGUNDA OFICIAL EXAMINADORA DESIGNADA, LCDA.

---

[14] *Íd.,* Anejo 41, págs. 1,531-1,577.
[15] *Íd.,* Anejo 42, págs. 1,578-1,581. Notificado el 10 de enero de 2025 por correo electrónico y depositado el 13 de enero de 2025 por correo postal.

LOURDES R. VÁZQUEZ Y NO RESOLVER LA CONTROVERSIA SUSTANCIAL DE HECHOS EN TORNO A LA JORNADA LABORAL DEL QUERELLADO, CIERTOS ASPECTOS RELACIONADOS AL PUESTO Y LAS FUNCIONES Y RESPONSABILIDADES DEL PUESTO DE CONFIANZA [DE] VICEPRESIDENTE EJECUTIVO DE ADMINISTRACIÓN DE LA AAA.

4. ERRÓ EL DIRECTOR EJECUTIVO DE LA OEG AL ADOPTAR EN SU TOTALIDAD EL INFORME DEL CUARTO OFICIAL EXAMINADOR DESIGNADO, LCDO. JAIME A. VÁZQUEZ COLÓN, QUIEN NO EVALUÓ NI CONSIDERÓ LA TOTALIDAD DE LA PRUEBA PRESENTADA POR LA PARTE QUERELLADA EN SU SOLICITUD DE RESOLUCIÓN SUMARIA Y RÉPLICA A LOS FINES DE PODER PRECISAR CUÁL ERA LA JORNADA LABORAL DEL QUERELLADO; CIERTOS ASPECTOS RELACIONADOS AL PUESTO Y LAS FUNCIONES DEL SEÑOR ARROYO MUÑIZ AL OCUPAR EL PUESTO DE CONFIANZA [DE] VICEPRESIDENTE EJECUTIVO DE ADMINISTRACIÓN DE LA AAA, SEGÚN FUERA REQUERIDO MEDIANTE LA ORDEN FECHADA 23 DE ENERO DE 2023 DICTADA POR LA SEGUNDA OFICIAL EXAMINADORA DESIGNADA, LCDA. LOURDES R. VÁZQUEZ.

5. ERRÓ EL DIRECTOR EJECUTIVO DE LA OEG AL ADOPTAR EN SU TOTALIDAD EL INFORME DEL CUARTO OFICIAL EXAMINADOR DESIGNADO, LCDO. JAIME A. VÁZQUEZ COLÓN, QUIEN NO SOSTENIDO EN LA EVIDENCIA PRESENTADA DETERMINÓ QUE LA PARTE QUERELLADA INCURRIÓ EN VIOLACIÓN DE LOS INCISOS (B) Y (R) DEL ARTÍCULO 4.2 [DE LA] LEY [NÚM.] 1-2012, SEGÚN ENMENDADA; AL APLICAR EL QUANTUM DE PREPONDERANCIA DE LA PRUEBA EN VEZ DEL QUANTUM DE PRUEBA CLARA, ROBUSTA Y CONVINCENTE REQUERIDO POR EL ESTADO DE DERECHO VIGENTE.

6. ERRÓ EL DIRECTOR EJECUTIVO DE LA OEG AL ADOPTAR EN SU TOTALIDAD EL INFORME DEL CUARTO OFICIAL EXAMINADOR DESIGNADO, LCDO. JAIME A. VÁZQUEZ COLÓN QUIEN DETERMINÓ QUE LA PARTE QUERELLADA INCURRIÓ EN VIOLACIÓN DE LOS INCISOS (B) Y (R) DEL ARTÍCULO 4.2 [DE LA] LEY [NÚM.] 1-2012, SEGÚN ENMENDADA; AL INTERPRETAR INCORRECTAMENTE LA LEY [NÚM.] 60-2014 Y DETERMINAR QUE EL QUERELLADO VIOLÓ LOS ARTÍCULOS 3 Y 5; E INTERPRETAR INCORRECTAMENTE LA OA-2015-003 Y SU APLICACIÓN A LOS HECHOS DEL CASO ESPECÍFICAMENTE LA AUTORIZACIÓN CONCEDIDA AL QUERELLADO POR SU SUPERVISOR INMEDIATO, ING. ELÍ D[Í]AZ ATIENZA.

7. ERRÓ E INCURRIÓ EN ABUSO DE SU DISCRECIÓN EL DIRECTOR EJECUTIVO DE LA OEG AL IMPONER UNA MULTA ARBITRARIA E IRRAZONABLE DE $5,000 AL QUERELLADO Y LA MEDIDA ADMINISTRATIVA DE RESTITUCIÓN DE $5,912.26, POR AMBAS NO PROCEDER EN ESTRICTO DERECHO HABIENDO UTILIZADO EL QUERELLADO, SIEMPRE, EL VEHÍCULO OFICIAL ASIGNADO DENTRO DE SU JORNADA LABORAL Y PARA LA REALIZACIÓN DE LAS FUNCIONES DEL PUESTO DE CONFIANZA QUE OCUPABA EN LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS DE PUERTO [RICO], SIN QUE EXISTA ALGUNA

JUSTIFICACIÓN VÁLIDA EXPRESA Y SIN QUE LA LEY [NÚM.]1-2012, SEGÚN ENMENDADA[,] NI EL REGLAMENTO DE ASUNTOS PROGRAMÁTICOS DE LA OEG ESTABLEZCAN CRITERIOS Y PARÁMETROS UNIFORMES PARA LA DETERMINACIÓN DE LAS CUANTÍAS DE LAS MULTAS IMPUESTAS.

En esencia, el recurrido arguyó que el director ejecutivo de la OEG erró al no desestimar y archivar la *Querella* presentada tardíamente, en contravención de los términos de investigación expuestos en el Artículo 7.1 de la *Ley de Ética Gubernamental, supra,* sec. 1860. Ello, en vista de que la OEG tenía hasta dos (2) años y seis (6) meses para realizar una investigación preliminar y exhaustiva en contra de un servidor público, mediando justa causa. Así, indicó que desde el 8 de marzo de 2018, comenzó a transcurrir el término de noventa (90) días, hasta el 6 de junio de 2018, para realizar la investigación preliminar que podía prorrogarse por noventa (90) días adicionales, hasta el 6 de septiembre de 2018. Sin embargo, señaló que la recurrida no solicitó la prórroga. Igualmente, esgrimió que la OEG no demostró justa causa para solicitar las dos (2) prórrogas del término de un año para la investigación exhaustiva, hasta el 6 de septiembre de 2020. Sobre el particular, alegó que los términos de investigación preliminar y exhaustiva bajo la *Ley de Ética Gubernamental, supra,* eran directivos o de estricto cumplimiento, por lo que no se podían prorrogar sin mediar justa causa. En este sentido, alegó que la recurrida perdió su jurisdicción el 6 de septiembre de 2020, por lo que toda gestión realizada posterior a dicha fecha fue *ultra vires*. Por otro lado, indicó que, una vez sometido el caso, el oficial examinador debió remitirlo al director ejecutivo para que emitiera una resolución final dentro de noventa (90) días, a tenor con el Artículo 6.14 del *Reglamento de Asuntos Programáticos de la OEG*, Reglamento Núm. 8231, Departamento de Estado, 18 de julio de 2012 y el Artículo 3.14 de la LPAUG, *supra,* sec. 9654.

Por otra parte, el recurrente consideró que no se presentó prueba clara, robusta ni convincente sobre que incurrió en una

violación ética. Pues, arguyó que alegar que utilizó el vehículo oficial para beneficio personal al estacionarlo a solo diez (10) minutos de su residencia ignoraba que tenía la responsabilidad de realizar un sinnúmero de gestiones durante el trayecto de Aguadilla a San Juan.

Asimismo, subrayó que la OEG erró al restar sólo siete (7) viajes de los ciento treinta y tres (133) imputados inicialmente por la emergencia de los huracanes Irma y María desde el 22 de septiembre de 2017 al 27 de octubre de 2017. Pues, indicó que la OEG ignoró que la AAA estuvo en estado de emergencia desde agosto de 2017 hasta posterior a su salida.

A su vez, puntualizó que ejercía los deberes y las facultades de su puesto como vicepresidente ejecutivo de administración de la AAA no solamente en la Sede en San Juan, sino también en las cinco (5) regiones que componían la agencia. A saber, subrayó que supervisaba los directorados de Recursos Humanos y Relaciones Laborales, Seguridad Corporativa y Manejo de Emergencias, Compra y Logística y Administración Central. Asimismo, particularizó que tenía que atender los eventos de emergencia de huracanes, incendios, terremotos, vandalismos y escapes de cloro en las plantas de filtro.

Interpretó que el Artículo 5 de la *Ley de Vehículos Oficiales*, *supra*, 3 LPRA sec. 9094, no prohibía que, luego de culminar la jornada laboral, los funcionarios estacionaran los vehículos oficiales en las facilidades cercanas a sus residencias. En cambio, expresó que el acto prohibitivo era estacionar los vehículos fuera de los predios de la agencia o llevarlos para sus residencias. Asimismo, indicó que la OEG no rebatió el hecho esencial de que su supervisor inmediato lo autorizó de manera legal a estacionar el vehículo oficial en las instalaciones de Operaciones en Aguadilla, debido a las funciones inherentes de su cargo de estar listo para atender situaciones que surgieran en cualquier momento.

Igualmente, arguyó que no violentó el inciso (r) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a, ya que no omitió el cumplimiento de un deber impuesto por ley o reglamento ni sus actuaciones ocasionaron la pérdida de fondos públicos. Pues, indicó que la AAA era la responsable de pagar los gastos de peaje, mantenimiento y gasolina mientras los empleados desempeñaran sus funciones oficiales.

Posteriormente, el 18 de febrero de 2025, la OEG presentó una *Solicitud de Desestimación de Recurso de Revisión por Falta de Jurisdicción.* En su escrito, relató que el 10 de enero de 2025, notificó la *Resolución en Reconsideración* por correo electrónico, la cual notificó nuevamente el 13 de enero de 2025 por correo postal. No obstante, adujo que, en vista de que el señor Arroyo Muñiz recibió una notificación adecuada desde que se emitió por correo electrónico, el término de treinta (30) días para presentar este recurso venció el 10 de febrero de 2025. Por consiguiente, arguyó que el recurso debía desestimarse por presentarse el 12 de febrero de 2025, fuera del término jurisdiccional. De otra parte, señaló que las copias que el recurrente le envió para notificarle sobre este recurso carecían de los sellos de la fecha y hora de su presentación, según requería la Regla 58 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 58. Al respecto, indicó que ese recurso se debía desestimar por notificación defectuosa, ya que el recurrente no solicitó una prórroga para notificar su presentación adecuadamente.

Al día siguiente, el señor Arroyo Muñiz se opuso a la desestimación del recurso. Alegó que el mismo se presentó dentro del término jurisdiccional de treinta (30) días a partir del 13 de enero de 2025, fecha indicada en el matasello postal que constituyó la prueba fehaciente sobre que la OEG envió su determinación por correo regular. A su vez, se sostuvo en su alegación de que la notificación de la *Resolución en Reconsideración* por correo electrónico adolecía de

defectos tanto de forma como de contenido. Por otro lado, admitió que omitió la notificación de las dos (2) copias del recurso de revisión a la OEG con el ponche de presentación. No obstante, informó que procedía a subsanar el defecto.

El 21 de febrero de 2025, la OEG presentó una réplica a la oposición del señor Arroyo Muñiz a la solicitud de desestimación. En esta, reconoció que la notificación mediante correo electrónico de la *Resolución en Reconsideración* adolecía de errores de redacción, ya que la Secretaría de la OEG certificó que el 6 de diciembre de 2024 se archivó copia de la *Notificación* y de la *Resolución,* en lugar de decir el 10 de enero de 2025. A su vez, expresó que el documento indicó que la *Resolución* se dictó el 10 de enero de 2025, cuando en realidad ocurrió el 9 de enero de 2025. Sin embargo, arguyó que se trataba de defectos subsanables que no obstaculizaron que el 10 de enero de 2025 se le notificara la *Resolución en Reconsideración* al recurrente.

Subsiguientemente, el 28 de febrero de 2025, el señor Arroyo Muñiz presentó una Moción en Cumplimiento de Orden. Esencialmente, reiteró su posición en que este recurso se presentó dentro del término jurisdiccional de treinta (30) días a partir de la fecha del matasello postal de la notificación de la *Resolución en Reconsideración* emitida por la OEG. A su vez, alegó que su representante legal no recibió la notificación de la *Resolución en Reconsideración* en su correo electrónico principal, sino en un correo que se dañó durante el apagón del 31 de diciembre de 2024.

Más adelante, el 21 de marzo de 2025, la OEG presentó su alegato en oposición al recurso de revisión judicial. En su escrito, explicó que al recibir el planteamiento del entonces representante Bianchi Angleró el 8 de marzo de 2018, el primer término de noventa (90) días para realizar la investigación preliminar culminó el 6 de junio de 2018 y el segundo término de noventa (90) días venció el 4 de septiembre de 2018. De esta forma, reiteró que el 4 de septiembre

de 2019 culminó la primera prórroga de un año para realizar la investigación exhaustiva y el 4 de septiembre de 2020 terminó la segunda prórroga. Además, expresó que las circunstancias extraordinarias del COVID-19 justificaron la extensión del término para concluir la investigación y presentar la *Querella* a los tres (3) meses y diecinueve (19) días de culminar la investigación exhaustiva.

La OEG puntualizó que el 7 de marzo de 2018 y el 29 de agosto de 2019 solicitó las prórrogas para la extensión de los plazos de la investigación preliminar y exhaustiva, respectivamente. No obstante lo anterior, indicó que la *Ley de Ética Gubernamental, supra,* no requiere que la extensión del término investigativo se solicite por escrito ni que se emita una determinación para concederla. Asimismo, señaló que la determinación de prorrogar los términos investigativos no era arbitraria, ya que fue el resultado de un balance razonable y concienzudo de las circunstancias particulares de la complejidad del asunto y las gestiones investigativas que faltaban por realizar, las cuales no dependían únicamente de la agencia. Por ello, apuntó que no existió un periodo de inacción durante la etapa investigativa. Asimismo, subrayó que la agencia no perdió jurisdicción para presentar la *Querella* fuera del término investigativo, ya que cumplió con los términos de cumplimiento estricto y de justa causa dispuestos en el Artículo 7.1 de la *Ley de Ética Gubernamental, supra,* sec. 1860.

Igualmente, adujo que este Tribunal atendió previamente el señalamiento de error relacionado a que la *Resolución* final se emitió en exceso del periodo de noventa (90) días desde que el caso quedó sometido, a tenor con el Artículo 6.15 del Reglamento de Asuntos Pragmático de la OEG, *supra,* y la Sección 3.14 de la LPAUG, *supra,* sec. 9654. Ello, puesto que el 11 de diciembre de 2024, este Tribunal emitió una *Resolución* en la que denegó expedir el auto de *mandamus*

solicitado por el señor Arroyo Muñiz, ya que el recurso se tornó académico por la OEG emitir su *Resolución* el 5 de diciembre de 2024.

Por otro lado, la OEG manifestó que el señor Arroyo Muñiz no tenía razón en alegar que la agencia no consideró sus funciones y su jornada laboral al adjudicar las controversias. Pues, esgrimió que la controversia de este caso no estribó sobre el uso legítimo del vehículo oficial dentro del desempeño de las funciones como vicepresidente ejecutivo de administración de la AAA sino en el uso personal ilegítimo que el recurrente le otorgó para transportarse del área de su residencia hasta su lugar de empleo en San Juan. A la vez, planteó que el desplazamiento de los servidores públicos hacia sus lugares de trabajo y retorno a sus lugares de residencia no era parte de la jornada laboral, según la *Ley de Vehículos Oficiales, supra.*

La OEG hizo constar que, aunque las funciones del puesto del recurrente le requerían estar disponible para trabajar fuera de su horario regular, incluso los fines de semana y los días feriados, lo cierto era que tenía un horario de trabajo fijo de 7:00 a.m. a 4:00 p.m. en la Sede de la AAA en San Juan. Empero, puntualizó que las transacciones de los peajes y las bitácoras vehiculares demostraron de forma clara, robusta y convincente que los ciento veintiséis (126) desplazamientos que el señor Arroyo Muñiz realizó desde el 7 de junio de 2017 al 20 de agosto de 2017 y desde el 12 de diciembre de 2017 al 8 de marzo de 2018 no estaban vinculados con sus funciones oficiales. Sobre el particular, puntualizó que el hecho de que el señor Arroyo Muñiz gestionara llamadas telefónicas y coordinara trabajos mientras conducía no hacía necesario utilizar el vehículo oficial. Asimismo, apuntó que el oficial examinador no consideró el uso del vehículo oficial para visitar los almacenes, realizar las pruebas de dopaje, los contratos y las subasta, atender los asuntos laborales y administrativo, entre otras funciones oficiales.

Además, expuso que, contrario a lo establecido en la Orden Administrativa 2015-03, el señor Arroyo Muñiz no atendía de forma directa, personal ni inmediata las emergencias relacionadas con la operación y el mantenimiento de los sistemas de la AAA. Mencionó que un Panel Hermano de este Tribunal expuso lo siguiente en el caso *OEG v. Díaz Atienza*, KLRA202400531:

> Aun cuando aceptáramos, según arguye el señor Díaz Atienza, que la Orden Administrativa OA-2015-03 le facultó para otorgar el permiso al señor Arroyo Muñiz, lo cierto es que el señor Arroyo Muñiz no tenía las funciones de emergencia a las que hace referencia la excepción. Por tanto, este no teniendo las funciones de atención inmediata tales descritas en referida Orden, el presidente, señor Díaz Atienza, no estaba facultado de otorgar un permiso para que el señor Arroyo Muñiz entregara el vehículo en una sede diferente a la de su lugar de trabajo.

Por último, afirmó que el recurrente se equivocó al alegar que la multa y la medida administrativa de restitución eran arbitrarias e irrazonables. La recurrida expresó que el Artículo 4.7 (c) de la *Ley de Vehículos Oficiales, supra,* sec. 1857f, le reconoció gran discreción a la OEG de imponer multas administrativas que no excedieran de $20,000.00 por cada violación. Así, señaló que como resultado del uso indebido del vehículo oficial en ciento veintiséis (126) ocasiones que totalizó las ciento sesenta y dos (162) millas diarias, el señor Arroyo Muñiz ocasionó la pérdida de fondos públicos por $2,244.66 en gasolina, $1,140.27 en peaje y $2,527.33 por el desgaste y mantenimiento del vehículo oficial, sumas que se le ordenó restituir, conjunto con una multa de $2,500 por cada violación incurrida.

En atención a los errores planteados por el recurrente, procedemos a exponer la normativa jurídica atinente a este recurso.

## II.

### A. Revisión judicial

La LPAUG, *supra,* dispone un procedimiento uniforme para la revisión judicial de una adjudicación administrativa. *Gobierno PR v. Torres Rodríguez,* 210 DPR 891, 907 (2022); *Cordero Vargas v. Pérez Pérez,* 198 DPR 848, 857 (2017). Por virtud de la revisión judicial, el

Tribunal de Apelaciones puede revisar las decisiones, órdenes y resoluciones finales emitidas por un organismo o una agencia administrativa. Artículo 4.006(c) de la *Ley de la Judicatura*, Ley Núm. 201-2003, según enmendada, 4 LPRA sec. 24y. El objetivo de este recurso es asegurar que el organismo administrativo actuó de conformidad con el poder delegado y la política legislativa. *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022); D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 3ra ed., Bogotá, Forum, 2013, pág. 669.

Ahora bien, los tribunales apelativos debemos otorgarles deferencia a las determinaciones de los organismos administrativos, puesto que poseen la experiencia y el conocimiento especializado sobre el asunto que se le delegó. *Transporte Sonnell, LLC v. Junta Subastas Aut. Carreteras*, 2024 TSPR 82; *Otero Rivera v. Bella Detail Group, Inc., y otros*, 2024 TSPR 70; *Violí Violá Corp. et al., v. Mun. Guaynabo*, 213 DPR 743 (2024); *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99, 114 (2023); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016). Por ello, las determinaciones del organismo administrativo gozan de una presunción de legalidad y corrección. *Transporte Sonnell, LLC v. Junta Subastas Aut. Carreteras, supra*; *Otero Rivera v. Bella Detail Group, Inc., y otros, supra*; *Torres Rivera v. Policía de PR, supra*. Esta presunción subsiste mientras la parte que impugne la decisión administrativa demuestre que las determinaciones de hechos no están basadas en el expediente o que las conclusiones de derecho son irrazonables. *OEG v. Martínez Giraud, supra*, pág. 89.

En tal virtud, la revisión judicial está cimentada en el criterio de razonabilidad de la actuación administrativa. *Hernández Feliciano v. Mun. Quebradillas, supra*; pág. 115; *Torres Rivera v. Policía de PR, supra*. A saber, los foros apelativos estamos limitados a evaluar tres

(3) aspectos: (1) si el remedio concedido fue apropiado; (2) si las determinaciones de hechos se sostienen por evidencia sustancial contenida en el expediente administrativo, y (3) si las conclusiones de derecho de la agencia se sostienen. *Hernández Feliciano v. Mun. Quebradillas, supra; Torres Rivera v. Policía de PR, supra,* págs. 626-627; *Moreno Lorenzo y otros v. Depto. Fam.,* 207 DPR 833, 839-840 (2021); *Capó Cruz v. Jta. Planificación et al.,* 204 DPR 581, 591 (2020).

Los foros revisores sostendremos las determinaciones de hechos formuladas por la agencia, si están basadas en evidencia sustancial que obra en el expediente administrativo. Sec. 4.5 de LPAUG, *supra,* sec. 9675. La evidencia sustancial es aquella que una mente razonable podría aceptar como adecuada para sostener una conclusión. *OEG v. Martínez Giraud, supra,* pág. 90.

Por otro lado, las conclusiones de derecho de la agencia serán revisables en todos sus aspectos. Sec. 4.5 de LPAUG, *supra,* sec. 9675. Sin embargo, los foros apelativos debemos otorgarle peso a la interpretación de la agencia sobre aquellas leyes que les corresponde aplicar. *Hernández, Álvarez v. Centro Unido,* 168 DPR 592, 615 (2006). Esto, puesto que "las agencias administrativas son instrumentos necesarios para la interpretación de la ley". D. Fernández Quiñones, *op. cit.,* pág. 716. De esta forma, la revisión judicial se circunscribirá a determinar si la interpretación del organismo administrativo fue razonable, a la luz de las pautas establecidas por la Asamblea Legislativa. *Hernández, Álvarez v. Centro Unido, supra,* pág. 616. Si la interpretación de la agencia fue razonable, aun cuando no sea la única, los tribunales le otorgaremos deferencia. *Íd.* No obstante, la deferencia a la interpretación de la agencia no significa que los foros judiciales renunciaremos a nuestra función revisora, ya que debemos diferir cuando el organismo administrativo (1) erró al aplicar la ley; (2) actuó de forma arbitraria, irrazonable o ilegal, o (3) lesionó derechos constitucionales

fundamentales. *Íd.*; *Hernández Feliciano v. Mun. Quebradillas, supra*; *Torres Rivera v. Policía de PR, supra*, pág. 628; *Fuertes y otros v. ARPe*, 134 DPR 947, 953 (1993).

Por último, las cuestiones mixtas de hechos y de derecho se considerarán como cuestiones de derecho, por lo que serán revisables en toda su extensión. *Super. Asphalt v. AFI y otro*, 206 DPR 803, 820 (2021); *Rivera v. A&C Development Corp.*, 144 DPR 450, 461 (1997).

**B. Prohibiciones éticas de la *Ley de Ética Gubernamental***

Le OEG se creó con el propósito de prevenir y penalizar el comportamiento delictivo de los funcionarios y empleados públicos que vulneren los principios básicos de una ética de excelencia en el desempeño de sus funciones como el abuso de poder y el ejercicio de influencias indebidas. *Pueblo v. Arlequín Vélez*, 204 DPR 117, 152 (2020); *OEG v. Santiago Guzmán*, 188 DPR 215 (2013); *OEG v. Cordero, Rivera*, 154 DPR 827, 848-851 (2001).

A fin de cumplir con lo anterior mediante la *Ley de Ética Gubernamental, supra*, la Asamblea Legislativa facultó a la Dirección Ejecutiva de la OEG a imponer sanciones a los infractores de sus disposiciones. *OEG v. Martínez Giraud, supra*, pág. 92.

El Artículo 4.2 de la *Ley de Ética Gubernamental, supra*, sec. 1857a, dispone una serie de prohibiciones éticas generales de un servidor público, entre las que se encuentran las siguientes:

> [...]
>
> (b) Un servidor público no puede utilizar los deberes y las facultades de su cargo ni la propiedad o los fondos públicos para obtener, directa o indirectamente, para él o para una persona privada o negocio, cualquier beneficio que no esté permitido por ley.
>
> [...]
>
> (r) Un servidor público no puede omitir el cumplimiento de un deber impuesto por ley o reglamento, si con ello ocasiona la pérdida de fondos públicos o produce daño a la propiedad pública.
>
> (s) Un servidor público no puede llevar a cabo una acción que ponga en duda la imparcialidad e integridad de la función gubernamental.

Para que se configure una infracción al referido Artículo se requiere demostrar que (1) un funcionario público, (2) utilizó sus deberes, facultades de su cargo, propiedad o fondos públicos, (3) con el fin de proporcionarse a sí mismo, algún familiar o a otra persona, (4) alguna ventaja, beneficio o privilegio. *Pueblo v. Arlequín Vélez*, supra, pág. 155; *OEG v. Rodríguez*, 159 DPR 98, 134 (2003). El término beneficio se refiere a "cualquier provecho, utilidad, lucro o ganancia, sin limitar el término a una ganancia pecuniaria o material, sino que denota cualquier forma de ventaja". Art. 1.2 (i) de la *Ley de Ética Gubernamental, supra,* sec. 1854.

En tal sentido, el Artículo 4.7 de la *Ley de Ética Gubernamental, supra,* sec. 1857f, establece las sanciones y las penalidades a las que se expone toda persona que viole el Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a, mediante la interposición de una acción administrativa. A saber, la Dirección Ejecutiva le puede imponer una multa administrativa que no excederá de $20,000 por cada violación, la sanción de triple daño y medidas administrativas, entre las que se encuentra ordenar la restitución. Art. 4.7 de la *Ley de Ética Gubernamental, supra,* sec. 1857f.

Es menester puntualizar que la mera apariencia de conflicto de intereses por sí solo no conlleva que se encuentre a un funcionario incurso en una violación ética. *OEG v. Cordero, Rivera, supra,* págs. 853-854. Pues, los procedimientos disciplinarios ante los foros administrativos requieren que la evidencia sea aquilatada a la luz del estándar de la prueba clara, robusta y convincente. *OEG v. Martínez Giraud, supra.* Esta prueba es "aquella evidencia que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probables". *Íd.,* pág. 94.

### C. Procedimiento administrativo ante la OEG

El Artículo 7.1 de la *Ley de Ética Gubernamental, supra*, sec. 1860, dispone el procedimiento investigativo que la OEG debe proseguir con respecto a un servidor público de la Rama Ejecutiva. A saber:

> (a) Cualquier persona puede solicitar de la Oficina que se inicie una investigación bajo las disposiciones de esta Ley. El planteamiento puede presentarse por cualquier medio, incluso de forma anónima. También, la Oficina puede *motu proprio* iniciar una investigación.
>
> (b) Dentro de los noventa días siguientes a la fecha de presentación del planteamiento, la Oficina realizará una investigación preliminar. Una vez culminada la investigación preliminar, si la Oficina entiende que procede efectuar una investigación exhaustiva, debe concluirla dentro del término de un año. Estos términos son de cumplimiento estricto. Si existe justa causa, la Oficina prorrogará estos términos hasta noventa días o un año, respectivamente. [...]

Al respecto, en el Artículo 6.4 del *Reglamento de Asuntos Programáticos de la OEG, supra*, se reconoce que el oficial examinador o juez administrativo tiene la facultad delegada por la Dirección Ejecutiva de, entre otras, prorrogar o acortar los términos en el curso del procedimiento.

Una vez culminada la etapa investigativa y de la OEG entender que se infringió alguna disposición de la referida Ley, reglamento u orden a su amparo, la agencia presentará una *Querella* e iniciará un procedimiento adjudicativo, a tenor con el Artículo 7.2 de la *Ley de Ética Gubernamental, supra*, sec. 1860a, la Sección 3.2 de la LPAUG, *supra*, sec. 9642, y el Artículo 6.5 del *Reglamento de Asuntos Programáticos de la OEG, supra*.

En lo que nos concierne, el Artículo 6.11 del *Reglamento de Asuntos Programáticos de la OEG, supra*, establece que una parte puede solicitar la resolución sumaria de todas o cualquiera de las controversias mediante la presentación de una moción no menos de veinte (20) días calendario previo a la celebración de una audiencia. Si todas las controversias se pueden resolver mediante una resolución sumaria, no se celebrará una audiencia y el oficial

examinador procederá a emitir su informe o el juez administrativo emitirá su resolución final. *Íd.*

Luego de celebrarse la audiencia o sometido el asunto, el oficial examinador deberá remitir a la Dirección Ejecutiva un informe que contendrá determinaciones de hecho, conclusiones de derecho y recomendaciones para la disposición final del caso, fundamentado en el expediente oficial. Art. 6.14 del *Reglamento de Asuntos Programáticos de la OEG, supra.* Tras evaluar el informe del oficial examinador, la Dirección Ejecutiva puede (1) hacerlo suyo en su totalidad y emitir una resolución final; (2) adoptar las determinaciones de hecho y formular sus propias conclusiones de derecho y emitir una resolución final, o (3) devolver el informe al oficial examinador para que realice determinaciones de hecho y conclusiones de derecho adicionales.

De acuerdo con el Artículo 6.15 del *Reglamento de Asuntos Programáticos de la OEG, supra,* dentro de los noventa (90) días calendario después que se concluyó la audiencia o se sometió el caso, la Dirección Ejecutiva emitirá una resolución final. La Sección 3.14 de la LPAUG, *supra,* sec. 9654, dispone que el término de noventa (90) días para emitir la orden o resolución final puede ser renunciado o ampliado con el consentimiento escrito de todas las partes o por causa justificada. Pues, dado que el término para emitir una determinación final es directivo, no jurisdiccional, el mismo puede ser prorrogado. *J. Exam. Tec. Méd. V. Elías et al.,* 144 DPR 483, 494-495 (1997). Ahora, la ampliación del término para emitir una resolución final sólo ocurre en circunstancias excepcionales, mediante el consentimiento de las partes o justa causa. *Lab. Inst. Med. Ava. v. Lab. C. Borinquen,* 149 DPR 121, 136 (1999). Entre las causas justificadas para extender un término se encuentra la complejidad inusitada del caso. *Íd.,* pág. 138.

Sin embargo, cuando la agencia no resuelve el caso dentro del término, el remedio legal que una parte tiene disponible dentro del término establecido por la LPAUG, *supra,* es la presentación de un *mandamus* en este Tribunal de Apelaciones. *J. Exam. Tec. Méd. V. Elías et al.,* *supra,* pág. 495.

### D. *Ley de Vehículos Oficiales*

Por medio de la *Ley de Vehículos Oficiales, supra,* la Asamblea Legislativa reconoció y estableció que el uso de los vehículos oficiales fuera de la jornada laboral es incompatible a la realidad económica de Puerto Rico. Asimismo, el Legislador enfatizó que los empleados que perciben los salarios más altos de las agencias deben asumir el mismo sacrificio de los empleados que utilizan sus propios recursos para viajar a sus centros de trabajo. *Íd.* Consecuentemente, se limitó el uso de los vehículos oficiales asignados a los jefes de agencias y funcionarios públicos únicamente a la gestión laboral y para el ejercicio exclusivo de la función pública.

En tal sentido, el Artículo 3 de la *Ley de Vehículos Oficiales, supra,* sec. 9092, dispone que ningún jefe de agencia o funcionario público está autorizado a utilizar un vehículo oficial tras concluir su jornada laboral. Mediante el referido estatuto se definió que la jornada laboral es "el per[í]odo destinado a rendir labores en una agencia, que puede extenderse a más de ocho (8) horas diarias, incluyendo los fines de semana". Art. 2 de la *Ley de Vehículos Oficiales, supra,* sec. 9091. De esta manera, al finalizar la jornada laboral, el jefe de agencia o el funcionario público tiene el deber de entregar el vehículo oficial a la agencia. Art. 4 de la *Ley de Vehículos Oficiales, supra,* sec. 9093. Además, deberá anotar en una bitácora, la hora de salida y llegada, el millaje del vehículo oficial al momento de la salida y llegada, así como un resumen del historial de los viajes realizados durante el día. *Íd.*

Cualquier jefe de agencia, funcionario público o persona natural o jurídica que infrinja la *Ley de Vehículos Oficiales, supra,* o algún reglamento adoptado a su amparo, tendrá que satisfacer una multa administrativa al Secretario de Hacienda por una cantidad no menor de $1,000.00 ni mayor de $5,000.00 por cada infracción. Art. 6 de la *Ley de Vehículos Oficiales, supra,* sec. 9095.

No obstante, la *Ley de Vehículos Oficiales, supra,* no será aplicable para los siguientes funcionarios públicos:

a.  Gobernador de Puerto Rico
b.  Secretario de Estado
c.  Secretario de Justicia
d.  Secretario del Departamento de Corrección y Rehabilitación
e.  Secretario del Departamento de Seguridad Pública
f.  Comisionado del Negociado de la Policía de Puerto Rico
g.  Comisionado del Negociado de Bomberos de Puerto Rico
h.  Comisionado del Negociado de Manejo de Emergencias y Administración de Desastres
i.  Comisionado del Negociado del Sistema de Emergencia 9-1-1
j.  Comisionado del Cuerpo de Vigilantes del Departamento de Recursos Naturales y Ambientales
k.  Comisionado del Negociado de Investigaciones Especiales
l.  Fiscal General de Puerto Rico
m.  Agentes encubiertos del Negociado de Investigaciones Especiales
n.  Agentes encubiertos, comandantes de zona, de área y comandantes auxiliares, directores de las divisiones de homicidios, inteligencia criminal y de drogas, directores de los cuerpos de investigaciones criminales, comandantes de distrito, comisionado auxiliar de operaciones de campo y su auxiliar y los directores de las divisiones de violencia doméstica del Negociado de la Policía de Puerto Rico.
o.  Comisionado del Negociado del Cuerpo de Emergencias Médicas. Art. 5 de la *Ley de Vehículos Oficiales, supra,* sec. 9094.

### E. Orden Administrativa 2015-03

La AAA emitió la Orden Administrativa 2015-03 del 20 de julio de 2015 respecto a la regulación del uso de los vehículos oficiales de la AAA, conforme con el Artículo VI de la Sección 9 de la Constitución del Estado Libre Asociado de Puerto Rico, la *Ley de Ética Gubernamental, supra;* la *Ley de Vehículos Oficiales, supra,* el Código de Ética para los Funcionarios y Empleados Públicos de la AAA, entre otras disposiciones. Su propósito es instaurar como política que su flota de vehículos se utilice en la función esencial de proveer un

servicio adecuado de agua y de alcantarillado sanitario y cualquier otro servicio o instalación incidental.

La referida Orden establece las siguientes medidas de control sobre el uso de los vehículos oficiales:

1. Los vehículos oficiales no podrán ser utilizados para asuntos personales, ya sea durante la jornada regular de trabajo o fuera de ella. Se autoriza el poder usar los vehículos oficiales en los periodos de tomar alimentos, a tales fines únicamente haciendo uso prudente y razonable de los mismos.

2. Todos los funcionarios y empleados de la Autoridad que utilicen un vehículo oficial anotarán en la Bitácora de Uso de Vehículos Oficiales del vehículo asignado la hora de salida y de llegada, el millaje del vehículo oficial al momento de la salida y al momento de la llegada, un resumen de los viajes realizados en el día y cualquier otra incidencia pertinente sobre el recogido, uso y entrega del vehículo.

3. **Los funcionarios y empleados de la Autoridad, una vez concluida su jornada laboral, entregarán el vehículo oficial que utilicen para realizar sus funciones en el lugar regular de trabajo. Sin embargo, aquellos funcionarios y empleados de la Autoridad que tienen la obligación de atender de forma directa y personal cualquier emergencia o situación que requiera atención inmediata relacionada con la operación y mantenimiento de los sistemas e instalaciones de agua y alcantarillados de la Autoridad, una vez concluida su jornada laboral entregarán el vehículo oficial en las instalaciones designadas por el Presidente Ejecutivo o su representante autorizado. Para determinar la instalación en la que se entregará el vehículo se tomará en consideración la naturaleza de las funciones que realiza el funcionario y/o empleado, la costo-eficiencia que representa para la Autoridad y para los servicios que presta a la ciudadanía; y el espacio y seguridad con que cuenta la instalación.**

4. **Cuando un funcionario o empleado esté laborando en un proyecto urgente o de emergencia que requiera su presencia hasta horas de la madrugada y se torne en irrazonable y/o peligroso para su seguridad personal entregar el vehículo en la instalación designada, el Presidente Ejecutivo o su representante autorizado, evaluarán la situación y podrán autorizar al funcionario o empleado, por vía de excepción, y para cada evento en específico, a llevarse el vehículo hasta su residencia. Al día siguiente, el empleado entregará el vehículo oficial en las instalaciones designadas y documentará en la bitácora tal situación.** (Énfasis nuestro).

Examinada la normativa jurídica pertinente a este recurso, procedemos a aplicarla a los hechos de este caso.

**III.**

En su primer señalamiento de error, el señor Arroyo Muñiz planteó que el director ejecutivo de la OEG incidió al no desestimar y archivar la *Querella*. El recurrente adujo que la acción en su contra prescribió por la agencia violentar el Artículo 7.1 de la *Ley de Ética Gubernamental, supra,* sec. 1860 al excederse de los términos de investigación. Tal como se ilustró en la parte expositiva, tras presentarse un planteamiento sobre una posible violación ética por parte de un funcionario público, la OEG disponía de noventa (90) días para realizar una investigación preliminar que se podía prorrogar por noventa (90) días adicionales. Una vez culminada la etapa de investigación preliminar, la OEG disponía de un año para realizar una investigación exhaustiva que igualmente se podía prorrogar por un año.

En este caso, las partes coincidieron en que el exrepresentante Bianchi Angleró presentó un planteamiento ante la OEG el día 8 de marzo de 2018, por lo que la recurrida disponía hasta el 6 de junio de 2018 para realizar la investigación preliminar que se podía extender por noventa (90) días adicionales hasta el 4 de septiembre de 2018. Más aún, la recurrida tenía un año hasta el 4 de septiembre de 2019 para efectuar una investigación exhaustiva, nuevamente prorrogable por un año hasta el 4 de septiembre de 2020. De la prueba documental obrante en el expediente surgió que desde el 28 de marzo de 2018 hasta el 17 de diciembre de 2020, la OEG realizó continuamente gestiones investigativas que principalmente versaron sobre el recibimiento de documentos por parte de diferentes agencias. La OEG demostró que la extensión de los términos de cumplimiento estricto de la etapa investigativa de este caso se justificó por la escasez de personal, las órdenes ejecutivas de cierre por la pandemia del COVID-19 y la espera de la respuesta de terceras personas. Una vez la OEG culminó la etapa investigativa y entendió que el señor

Arroyo Muñiz infringió la *Ley de Ética Gubernamental, supra,* el 23 de diciembre de 2020, inició el procedimiento adjudicativo mediante la presentación de una *Querella.*

Hacemos notar que el Artículo 7.2 de la *Ley de Ética Gubernamental, supra,* sec. 1860a, la Sección 3.2 de la LPAUG *supra,* sec. 9642, ni el *Reglamento de Asuntos Programáticos de la OEG, supra,* delimitaron un término específico en el que la agencia debía iniciar un procedimiento adjudicativo desde que se culminó la etapa investigativa. Aun así, en el presente caso solamente transcurrió un período de siete (7) días desde que la OEG culminó la etapa investigativa e interpuso la *Querella.* Por tal motivo, no tenía razón el señor Arroyo Muñiz al alegar que la *Querella* presentada por la OEG estaba prescrita, pues no existía una disposición legal que estableciera una limitación temporal para que la agencia iniciara la etapa adjudicativa una vez finalizara la investigativa. En ausencia de plazo definido, no actuó incorrectamente la recurrida al presentar la *Querella* de este caso el 23 de diciembre de 2020.

Como segundo señalamiento de error, el recurrente indicó que el director ejecutivo de la OEG erró al resolver el caso tardíamente, en exceso del término de noventa (90) días desde que quedó sometido para su resolución final. En este caso, 10 de agosto de 2023, el señor Arroyo Muñiz solicitó una *Solicitud de Resolución Sumaria* al amparo del Artículo 6.11 del *Reglamento de Asuntos Programáticos de la OEG, supra,* controversia que quedó sometida el 7 de noviembre de 2023. Alrededor de año más tarde, el 26 de noviembre de 2024, el oficial examinador designado emitió un *Informe,* el cual el director ejecutivo de la OEG acogió en su totalidad e hizo formar parte de la *Resolución* final emitida el 5 de diciembre de 2024. Ciertamente, el Artículo 6.15 del *Reglamento de Asuntos Programáticos de la OEG, supra,* establecía que tras quedar sometido el asunto, la Dirección Ejecutiva disponía de noventa (90) días calendario para emitir una resolución

final. Sin embargo, el señor Arroyo Muñiz ejerció efectivamente el remedio legal que tenía disponible de presentar un recurso de *mandamus* ante este Foro apelativo, el cual se tornó académico por la OEG emitir su *Resolución* final. Pese a lo anterior, no podemos soslayar que la Sección 3.14 de la LPAUG, *supra,* sec. 9654, dispone que el término para la agencia emitir una determinación final podía ampliarse por causa justificada. En este caso, la complejidad de la controversia así como la extensiva cantidad de documentos que formaron parte de las mociones como de los anejos presentados por las partes constituyeron causa justificada para el director ejecutivo de la OEG ampliar el mencionado término. Por ello, entendemos que la OEG no erró al emitir la determinación final del caso en exceso del término de noventa (90) días desde que quedó sometido.

Como tercer y cuarto señalamiento de error, el señor Arroyo Muñiz esgrimió que el director ejecutivo de la OEG incidió al no evaluar la totalidad de la prueba presentada por su persona y resolver las controversias sustanciales de hechos en torno a la jornada laboral del querellado y las responsabilidades de su puesto de confianza. En el *Informe* del oficial examinador acogido por el director ejecutivo de la OEG en su *Resolución* final, se estableció meridianamente que la OEG demostró que la jornada laboral del señor Arroyo Muñiz era en el horario regular de 7:30 a.m. a 4:00 p.m. en la Sede de la AAA en San Juan, además de estar disponible fuera del referido horario. A su vez, el oficial examinador designado precisó que entre las responsabilidades de su puesto, el recurrente estaba a cargo del funcionamiento operacional y administrativo de Recursos Humanos y Relaciones Laborales, Compra y Logísticas, Seguridad Corporativa y Manejo de Emergencias y Administración Central; así como establecer una comunicación directa con los directores de la agencia, representantes sindicales y de distintas agencias; participar en el desarrollo de estrategias, planes de acción y de contingencia; verificar

el desarrollo y el cumplimiento de las estrategias en las diferentes facilidades, instalaciones y plantas de la AAA y representar al presidente ejecutivo en las actividades que le fueran delegadas. Resolvemos que el recurrente no tiene la razón en sus planteamientos de error. Pues, surge indubitablemente que el oficial examinador, en el ejercicio de su función dispuesta en el Artículo 6.14 del *Reglamento de Asuntos Programáticos de la OEG, supra,* consideró los documentos del expediente oficial y formuló las determinaciones de hechos y conclusiones de derecho sostenidas por la prueba documental, incluyendo los hechos atinentes a la jornada laboral y las responsabilidades del recurrente, las cuales son razonables y merecen nuestra deferencia.

En su quinto y sexto señalamientos de error, el señor Arroyo Muñiz planteó que el director ejecutivo de la OEG erró al acoger el *Informe* del oficial examinador, en el que se determinó que el recurrente incurrió en violación de los incisos (b) y (r) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra,* sec. 1857a. Según el recurrente, la agencia aplicó erróneamente el estándar de la preponderancia de la prueba en vez de la prueba clara, robusta y convincente. Asimismo, sostuvo que la agencia interpretó incorrectamente la *Ley de Vehículos Oficiales, supra,* y la Orden Administrativa 2015-03 de la AAA, al no avalar la autorización concedida por el presidente ejecutivo, el señor Díaz Atienza. No le asiste la razón al recurrente.

El Artículo 3 de la *Ley de Vehículos Oficiales, supra,* sec. 9092, establecía de forma clara que ningún jefe de agencia ni funcionario público tenía autorización para utilizar el vehículo oficial tras concluir su jornada laboral. Por ello, al finalizar la jornada laboral, el funcionario público debía entregar el vehículo oficial a la agencia. Véase Art. 4 de la *Ley de Vehículos Oficiales, supra,* sec. 9091. De igual manera, la Orden Administrativa 2015-03 de la AAA disponía

que una vez concluida la jornada laboral, el funcionario o empleado de la AAA debía entregar el vehículo oficial en su lugar regular de trabajo. A modo de excepción, la referida Orden autorizaba a que los funcionarios que atendieran de forma directa y personal cualquier emergencia o situación que requiriera atención inmediata con la operación y el mantenimiento de los sistemas e instalación de agua y alcantarillados estacionaran los vehículos oficiales en las instalaciones designadas por el presidente ejecutivo. Este no fue el caso del señor Arroyo Muñiz.

El recurrente tenía una jornada laboral de 7:30 a.m. a 4:00 p.m. en la Sede de la AAA en San Juan. Sin embargo, indicó que durante el trayecto de las facilidades de Operaciones de Aguadilla a su lugar regular de trabajo en San Juan gestionaba llamadas telefónicas en las que coordinaba trabajo mientras conducía y que debía visitar las facilidades de la AAA. En particular, puntualizó que durante la emergencia de los huracanes Irma y María debió visitar diariamente el Centro de Operaciones de Emergencia en la Región de Aguadilla. Al respecto, cabe recordar que del cómputo de gastos incurridos del recurrente entre Aguadilla a San Juan se excluyeron los viajes relacionados a los huracanes Irma y María.

De otra parte, la propia bitácora vehicular que el señor Arroyo Muñiz debía realizar a tenor con la *Ley de Vehículos Oficiales, supra*, y la Orden Administrativa 2015-03 de la AAA, reflejó palmariamente que sus gestiones públicas no estaban relacionadas con atender de forma directa y personal cualquier emergencia o situación que requiriera su atención inmediata o que estuviese relacionada con la operación y el mantenimiento de los sistemas e instalación de agua y alcantarillados. Pues, un análisis sosegado de la referida bitácora vehicular develó de manera clara, robusta y convincente que el recurrente ejerció su función pública en su lugar de empleo en la Sede de la AAA, en agencias gubernamentales en San Juan y

municipios limítrofes. La mayor parte del resumen de viajes realizados disponen que el señor Arroyo Muñiz se transportó desde las instalaciones de Operaciones de la AAA en Aguadilla a la Sede en San Juan y regresó. Inclusive, el referido documento demostró que ciertas gestiones relacionadas a los huracanes Irma y María se realizaron desde la Sede de la AAA en San Juan. Por ello, no se justificaba que el señor Arroyo Muñiz estacionara el vehículo oficial en las instalaciones de Operaciones en Aguadilla. Pues, más allá de estacionar el vehículo en una facilidad de la AAA convenientemente cercana a su residencia y que le facilitara el transporte hacia su lugar de trabajo en San Juan, la prueba que obra en el expediente no demostró que el recurrente ejerció una función que requería estacionar el vehículo oficial fuera de la Sede de la AAA. Esto, con excepción de las gestiones realizadas en el período de la emergencia de los huracanes Irma y María. De esta forma, no atisbamos que el oficial jurídico designado ni el director ejecutivo de la OEG erraran en la interpretación del Artículo 4 de la *Ley de Vehículos Oficiales, supra,* sec. 9091 y la Orden Administrativa 2015-03 de la AAA a los efectos de que el señor Arroyo Muñiz debía estacionar el vehículo oficial en la Sede de la AAA en San Juan, tras concluir su jornada laboral.

Además, aun cuando la Orden Administrativa 2015-03 de la AAA facultaba que el presidente ejecutivo designara un lugar alterno para que los funcionarios de la AAA estacionaran los vehículos oficiales, dicha disposición establecía diáfanamente que debía estar relacionado a una situación de emergencia o que requiriera atención inmediata relacionada a la operación y al mantenimiento de los sistemas e instalaciones de agua y alcantarillados. Bajo ninguna circunstancia la referida Orden facultaba al presidente ejecutivo para que autorizara que los funcionarios públicos de la AAA estacionasen los vehículos oficiales en las diferentes facilidades de la agencia por el simple hecho de que les quedara cerca de su residencia y se

economizaran el pago de gasolina, peaje y mantenimiento de su vehículos personales. Dado que los documentos no reflejaron que el recurrente realizó tales funciones públicas o que atendió una situación de emergencia o inmediata en las ciento veintiséis (126) ocasiones en que se transportó en el vehículo oficial desde Aguadilla hasta San Juan, no incidió la OEG al resolver que no se justificó la asignación de un lugar alterno de entrega del vehículo oficial. Esto, máxime que no se evidenció que el presidente ejecutivo evaluó la naturaleza de las funciones del recurrente, la costo-eficiencia que representaba para la AAA estacionar el vehículo oficial en Aguadilla, los servicios que prestaba el señor Arroyo Muñiz ni el espacio o la seguridad de la instalación. Pues, el propósito de la *Ley de Vehículos Oficiales, supra*, era precisamente evitar que los altos funcionarios de las agencias gubernamentales se beneficiaran de los vehículos oficiales como transporte personal hacia sus lugares de empleo, sin ejercer una función pública.

Así las cosas, la OEG demostró mediante prueba clara, robusta y convincente que el señor Arroyo Muñiz infringió los incisos (b) y (r) del Artículo 4.2 de la *Ley de Ética Gubernamental, supra*, sec. 1857a al utilizar el vehículo oficial asignado en contravención de la *Ley de Vehículos Oficiales, supra*, y la Orden Administrativa 2015-03 de la AAA, para transportarse desde una facilidad de la AAA cercana a su residencia hasta su lugar de empleo en San Juan. No incidió al concluir que el recurrente, como funcionario público, utilizó los deberes y las facultades de su puesto, con el fin de proporcionarse un beneficio que no estaba permitido por ley. Al omitir el cumplimiento con las disposiciones de la Ley *de Vehículos Oficiales, supra*, y la Orden Administrativa 2015-03 de la AAA, el señor Arroyo Muñiz ocasionó la pérdida de fondos públicos. Por ello, la interpretación del oficial examinador y del director ejecutivo de la OEG sobre las antes mencionadas disposiciones legales fue correcta.

Por último, en su séptimo señalamiento de error, el señor Arroyo Muñiz planteó que el director ejecutivo de la OEG incidió al imponer una multa arbitraria e irrazonable de $2,500.00 por cada infracción y una medida administrativa de restitución total de $5,912.26 para reembolsar los gastos de peaje, gasolina y mantenimiento del vehículo oficial. El recurrente arguyó que utilizó el vehículo oficial asignado dentro de su jornada laboral y para la realización de las funciones de su puesto. Al respecto, es preciso reiterar que el oficial examinador y el director ejecutivo de la OEG no incidieron al determinar que ciertamente el recurrido utilizó el vehículo oficial asignado para beneficio personal fuera de su jornada laboral y del alcance de las funciones de su puesto. Ante ello, el Artículo de la *Ley de Vehículos Oficiales, supra*, sec. 9095, disponía que de encontrar que un funcionario público violentó las disposiciones de la Ley, tendrá que satisfacer una multa administrativa al Secretario de Hacienda por una cantidad que no fuera menor de $1,000 ni mayor de $5,000 por cada infracción. Igualmente, el Artículo 4.7 de la *Ley de Ética Gubernamental, supra*, sec. 1857f, establecía que Dirección Ejecutiva podía imponer una multa administrativa que no se excediera de $20,000 por cada violación, la sanción de triple daño y medidas administrativas, entre las que se encuentra ordenar la restitución. A su vez, de las determinaciones de hechos bien formuladas por el oficial examinador surgió que desde el 4 de abril de 2017 al 7 de marzo de 2018, el señor Arroyo Muñiz utilizó en ciento veintiséis (126) ocasiones el vehículo oficial para transportarse desde Aguadilla hasta San Juan y viceversa antes y después de finalizar su jornada laboral. Dichos viajes conllevaron el desembolso de fondos públicos para sufragar los siguientes gastos: $2,244.66 en gasolina, $1,140.27 en peajes y $2,527.33 por desgaste y mantenimiento del vehículo, sin incluir los

viajes incurridos desde el 22 de septiembre de 2017 hasta el 27 de octubre de 2017 por los huracanes Irma y María por Puerto Rico.

Sobre el particular, es norma reiterada que las agencias gozan de una amplia discreción al imponer sanciones, ya que están en mejor posición que esta Curia apelativa en sopesar el efecto de la violación al sector reglamentado. Por ello, no tiene razón el señor Arroyo Muñiz al alegar que abusó de su discreción el director ejecutivo de la OEG al imponer una multa administrativa y una medida de restitución. Dichas sanciones fueron apropiadas, estuvieron debidamente fundamentadas en la evidencia documental y relacionada con los actos cometidos por el recurrente.

Así las cosas, no entrevemos que el Informe del oficial examinador designado ni la *Resolución* emitida por el director ejecutivo de la OEG erraron en la aplicación del derecho, fue arbitraria, irrazonable o ilegal o lesionó un derecho fundamental para diferir de la interpretación del organismo administrativo. Examinados cuidadosamente y en su totalidad los planteamientos de ambas partes, los documentos en los que se sostienen, así como el derecho aplicable, se confirma la determinación recurrida.

## IV.

Por las razones que anteceden, se confirma la determinación recurrida.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

El Juez Sánchez Ramos emitió un voto de conformidad por escrito.

El Juez Candelaria Rosa emitió un voto disidente por escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| OFICINA DE ÉTICA GUBERNALMENTAL<br><br>Recurrida<br><br>v.<br><br>YONIEL ARROYO MUÑIZ<br><br>Recurrente | KLRA202500096 | Revisión procedente de la Oficina de Ética Gubernamental<br><br>Caso Núm.: 21-37<br><br>Sobre: Violación al Artículo 4.2 (b), (r) y (s) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Candelaria Rosa y el Juez Marrero Guerrero.

### VOTO DE CONFORMIDAD DEL JUEZ SÁNCHEZ RAMOS

Aunque estoy conforme con la decisión que antecede, me parece apropiado abundar sobre mi determinación, ello por la naturaleza altamente peculiar de este caso.

No se trata de un caso con una solución evidente, obvia o fácil. Adviértase que no hay controversia sobre el hecho de que el supervisor directo del recurrente, entonces director ejecutivo de la Autoridad de Acueductos y Alcantarillados (el "Director"), fue quien autorizó al recurrente a incurrir en la conducta por la cual la Oficina de Ética Gubernamental (la "OEG") determinó sancionarlo.

De hecho, en un proceso separado, la OEG procesó con éxito al Director precisamente por autorizar la conducta del recurrente, ello al considerar que esta autorización no era permisible por ser contraria a la ley y a la propia normativa de la Autoridad. Véase Sentencia de 29 de enero de 2025, *Oficina de Ética Gubernamental v. Díaz Atienza*, KLRA202400531.

La dificultad radica en que no está claro, como cuestión de derecho, cuál es el estándar apropiado para evaluar la conducta de un subalterno cuando la misma, a pesar de estar prohibida por ley,



ha sido autorizada por un superior y podría razonablemente considerarse como legítima en las circunstancias particulares del caso. Es decir, ¿hasta qué punto tenía derecho el recurrente a confiar y descansar en la legitimidad de la autorización del Director?

En casos extremos, donde la conducta autorizada se aparta de forma patente y obvia de la normativa aplicable, resulta claro que el subalterno no tendría derecho a escudarse detrás de la autorización del superior para evadir una sanción de la OEG. No obstante, cuando el asunto puede dar pie a variadas interpretaciones razonables, el asunto se torna más complicado.

Aunque se trata de un asunto que considero muy cerrado, en ausencia de un estándar que nos vincule en este tipo de circunstancia, en este caso particular, considero que no era razonable que el recurrente descansara en la legitimidad de la autorización concedida por el Director. Ello pues la prueba apunta claramente a que, de ordinario, el recurrente realmente no usaba su vehículo para atender emergencias personalmente. No obstante, reconozco que es un asunto de difícil solución, en atención a la naturaleza del procedimiento ante la OEG y al estándar aplicable a la prueba que se debe presentar en este tipo de procedimiento.

En San Juan, Puerto Rico, a 30 de abril de 2025.

ROBERTO SÁNCHEZ RAMOS
JUEZ DE APELACIONES

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| OFICINA DE ÉTICA GUBERNALMENTAL<br><br>Recurrida<br><br><br>v.<br><br><br>YONIEL ARROYO MUÑIZ<br><br>Recurrente | KLRA202500096 | Revisión procedente de la Oficina de Ética Gubernamental<br><br><br>Caso Núm.: 21-37<br><br><br>Sobre: Violación al Artículo 4.2 (b), (r) y (s) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Candelaria Rosa y el Juez Marrero Guerrero.

**VOTO DISIDENTE**
**DEL JUEZ CANDELARIA ROSA**

En San Juan, Puerto Rico, a 30 de abril de 2025.

Disiento de la determinación a la que arriba la Sentencia suscrita por la mayoría del panel por considerar que la Oficina de Ética Gubernamental (OEG o recurrida) no logró presentar prueba clara, robusta y convincente de que el vicepresidente ejecutivo de administración de la Autoridad de Acueductos y Alcantarillados (AAA), el señor Yoniel Arroyo Muñiz (señor Arroyo Muñiz o recurrente), utilizó vehículos oficiales para beneficio personal. Sabido es que, toda vez que se cuestione el comportamiento de un funcionario público, aún sea por la simple apariencia de imparcialidad o deshonestidad, la OEG tiene la responsabilidad de establecer mediante prueba clara, robusta y convincente de que dicho funcionario público cometió los actos antiéticos imputados, así superando y descartando

todo planteamiento basado en inferencias, conjeturas, o percepciones a partir de relatos mediáticos insuflado por terceros. *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79 (2022). Dicho estándar de prueba es más exigente que aquel de la preponderancia de la prueba y supone aquella evidencia que produce en un juzgador de hechos la convicción duradera de que las contenciones fácticas son altamente probables. Íd. Véase, también, E.L. Chiesa Aponte, *Reglas de evidencia comentadas*, San Juan, Eds. SITUM, 2016, págs. 51-51.

Ahora bien, el Art. 4 de la Ley Núm. 60-2014 (3 LPRA sec. 9093) dispone que, al concluirse la jornada laboral de un funcionario público, éste entregará el vehículo oficial a la agencia. De su parte, la Orden Administrativa 2015-03 de la Autoridad de Acueductos y Alcantarillados (AAA) explica que los vehículos oficiales no podrán utilizarse para asuntos personales, dentro o fuera de la jornada regular de trabajo. Asimismo, el Art. 4 de la Ley Núm. 60-2014, *supra* y la Orden Administrativa 2015-03 disponen que el funcionario público deberá anotar en una bitácora (1) la hora de salida y llegada; (2) el millaje del vehículo oficial al momento de la salida y al momento de su llegada; (3) un resumen de los viajes realizados en el día; y (4) cualquier otra incidencia pertinente sobre el recogido, uso y entrega del vehículo.

A la luz de lo anterior, el hecho de que el señor Arroyo Muñiz haya utilizado un vehículo oficial de la AAA para transportarse desde las instalaciones de Operaciones en Aguadilla hasta su lugar de trabajo en la Sede de la AAA en San Juan no comportaba violación evidente del ordenamiento estatal o administrativo, ya que dicha transportación desde y hacia instalaciones de la propia agencia no comporta de suyo un asunto personal, sino el ejercicio autorizado de su trabajo. Si la OEG

quería convertir tal actuación en transgresión ética debía articular una teoría que superara la mera preponderancia y alcanzara la robustez y contundencia que le requiere el ordenamiento. No obstante, el recurrente cumplió cabalmente con los requisitos legales y administrativos al entregar el vehículo oficial en instalaciones de la AAA y anotar el uso del vehículo oficial, con sus respectivas horas y millajes en la *Bitácora Vehicular de Jornada Laboral Diaria* de la AAA. Más aun, dicha autorización laboral, que no fue rebatida por la AAA y vino del propio presidente ejecutivo de la AAA, Elí Díaz Atienza, tuvo un carácter institucional y partía de la interpretación de la ley y de su propia orden administrativa con respecto al vicepresidente ejecutivo de administración, a quien por la naturaleza de su puesto se le requería la atención permanente a sus funciones.

Luego, lo cierto es que la OEG descansa en especulaciones y sospechas articuladas mediáticamente que aluden a la intención del señor Arroyo Muñiz al utilizar un vehículo oficial de la AAA para transportarse entre la sede de la agencia a otra de sus propias dependencias, pero eluden demostrarla. Es decir, sus argumentos no demuestran sino presumen que el señor Arroyo Muñiz quiso sufragar los gastos de gasolina, peaje y mantenimiento del vehículo oficial en gestiones personales, cosa que si bien se pudiera asumirse sin mayor demostración de acciones como usar el vehículo para ir al cine, la playa o en ruta gastronómica, lo cierto es que en el ámbito de la gestión autorizada entre las dependencias de la agencia requería mayor justificación, en lugar de la instancia actual, en la que la recurrida parece imponer una intención de disfrute personal por el mero hecho de que en su lógica de mera preponderancia no encontró otra razón por la

cual el recurrente utilizaría el vehículo entre la Sede en San Juan y Operaciones en Aguadilla.

Por tanto, al amparo del ordenamiento jurídico pertinente era forzoso concluir que la OEG no presentó prueba clara, robusta y convincente de que el señor Arroyo Muñiz utilizó vehículos oficiales para asuntos personales. Por ello, respetuosamente disiento.


Carlos I. Candelaria Rosa
Juez de Apelaciones